OAKES v. MOHON.

In Banc. Feb. 27, 1950.

No. 37406 (44 So. (2d) 551)

**John S. Holmes,** for appellant.

484

Henry & Barbour, Lotterhos & Dunn, for appellee.

**McGehee, C. J.**

This appeal is from a judgment based upon the verdict of a jury in favor of the defendant, S. M. Mohon, in a suit for damages for a personal injury sustained by the plaintiff, Willie Oakes. It is urged by the plaintiff that the trial court erred in its instructions to the jury to such an extent as to influence an erroneous verdict in favor of the defendant. It is unnecessary that we discuss any other alleged errors on this appeal.

The defendant was engaged in the business of servicing oil wells in the Tinsley oil field, and correcting any trouble that arose in the operation of such wells. He had in his employ a crew of five men to do this work. He had placed O. C. Bradley in charge of the crew with full authority to direct the manner and method of the performance of the work to be done, and the other members of the crew, including the plaintiff, Willie Oakes, and Joe Oakes, Joe Heathcock, and W. M. Ellsey were expected to obey the orders of the said Bradley as foreman, or vice principal of the defendant. The plaintiff, his said employer, and the foreman all so testified.

On the occasion complained of it appears that one of a group of metal rods, 7/8 of an inch in diameter and 25 feet in length, had become unscrewed or broken far beneath the earth's surface and it was the duty of Joe Oakes, Joe Heathcock, and the plaintiff, Willie Oakes, to screw on the disconnected rod if found on investigation by them to be unscrewed from the rod below, or to replace the same if broken.

It further appears from the testimony on behalf of the plaintiff that his brother, Joe Oakes, was making a test to ascertain whether the rod was unscrewed or broken. For this purpose he used what is called by the witnesses a "sub" or a 4-foot piece of a 7/8 inch pipe; that Joe Oakes came to the conclusion that it was a "screw-on job" and so announced this fact to his foreman Bradley; that thereupon Joe Heathcock went to the truck nearby

to obtain the "spinning-wheel", a safety device made especially for fastening onto the top end of the rod, and to be turned by the men twisting the rod and screwing it onto the one from which it had been disconnected far beneath the earth; and that this spinning-wheel, the size of a wagon wheel, was found on the truck but Heathcock returned without it for the alleged reason that a small wedge which was indispensable to the use of the wheel was not found in the truck with the wheel, the same having been either misplaced or was in a steel box on the side of the truck at that time.

That thereupon Joe Oakes, who had hold of the 4-foot sub or pipe with one end resting against the bail of the elevator (which is not described in the testimony), and the other end against the rod which was to be turned and screwed back on, and who had been awaiting Heathcock's return with the spinning-wheel, was ordered by the foreman Bradley to go ahead with the work of turning the rod with the assistance of Heathcock so as to screw it back onto the one from which it had become disconnected, as they were "now rigged up"; that Heathcock then began to assist Joe Oakes in turning the rod in the ground by the use of this 4-foot sub or pipe, either by having the round edge of the 4-foot piece of pipe against the round edge of the rod, which extended down into the earth, or by having the end of this sub or pipe against the said rod, and when they had turned the rod a few rounds in attempting to screw it on, as they were ordered to do by the foreman, according to the implication of his command to go ahead as "you are now rigged up", the foreman ordered the plaintiff Willie Oakes, who was standing nearby, "to get a wrench and give them a hand", according to the testimony of Joe Oakes, and to "get a 24-inch Stillson wrench and give them a hand", according to the testimony of the plaintiff, Willie Oakes; that when the three men had thus turned the rod as far as it would go, or nearly as far as it would go, the 4-inch sub or pipe slipped off the rod and the rod began to re-

volve at rapid speed in reverse, on account of the friction or bind thereon which had been built up by the turning of the rod, and this caused all of the weight or pressure to be thrown on the Stillson wrench with which the plaintiff was holding the rod and helping to turn the same, and the wrench handle was thereby forced out of the hands of the plaintiff, while it revolved in the fashion of an airplane propeller, and it struck and broke the leg of the plaintiff above his knee, came loose from the rod, struck a piece of concrete, with such force and violence as to knock a piece of the concrete off, after having first knocked the plaintiff to the ground.

All of the testimony discloses that the placing of the 4-foot sub or pipe through the elevator and against the rod, which was being turned, was an unheard of performance, and that the attempt of the plaintiff to aid in turning the rod with a Stillson wrench under such circumstances was a dangerous mode and method of performing the work about which these three men were engaged.

The issue of fact in the case is whether or not the plaintiff was using the Stillson wrench to aid his two fellow-servants, under such circumstances, in compliance with an order from his foreman Bradley, or whether he had selected the 24-inch Stillson wrench of his own accord, without any previous command from his foreman to do so, in preference to selecting one of the chain tongs which were in the truck alongside this wrench, or the other Stillson wrench, which was 36 inches in length, since it was shown that a chain tong would ordinarily have been reasonably safe for his use in aiding his two fellow-servants in their efforts to screw on the rod.

The record is silent as to whether the use of the 36-inch Stillson wrench would have been safer than the use of the 24-inch Stillson wrench, but the proof on behalf of the defendant disclosed that there was in the truck, along with the other tools, what is called a "cheater" bar, which could have been fastened to the end of the Stillson

wrench handle so as to give the plaintiff more leverage and enable him to make his strength more effective in helping to turn the rod and place him farther away from the rod that he was helping to turn. But it is to be noted that the order which the plaintiff and Joe Oakes claimed was given to the plaintiff by the foreman Bradley was not that he get a Stillson wrench and a cheater bar and help in the work, but that he get "a wrench" or a "Stillson wrench" and do so. However, be that as it may, the fact remains that according to the testimony on behalf of the plaintiff, the foreman who was standing by and observing the operation, knew that the two fellow-servants of the plaintiff had adopted an unusual and dangerous method of trying to turn the rod with the 4-inch sub or pipe, which all the proof shows was likely to slip off the rod that they were undertaking to turn, and that in such situation he ordered the plaintiff to get a wrench or a Stillson wrench and to help them to turn the rod.

Thus it will be seen that however negligent the act of the two fellow-servants may have been, it was being performed on their part under the orders of the foreman when he told them to go ahead with the work as you are now rigged up; and therefore the injury sustained by the plaintiff could not have been due solely to the negligence of these two fellow-servants, nor solely to the negligence of the plaintiff when acting under the order of the foreman, and especially so if the latter knew that his order was one that the plaintiff was likely to obey.

It should be further noted that the employer Mohon testified that the two safe methods for doing the work about which these servants were engaged was that they either use the spinning wheel or chain tongs, and it is shown that they had theretofore used the spinning wheel for such purpose. There was testimony that most of the major oil companies used the spinning-wheel as the safer method of the two, whereas there is other testimony to show that the chain tongs were most commonly used for the purpose. The servants, including the plaintiff, had

ample experience in twisting these rods to screw them onto the rod far beneath the earth's surface, from which they had become disconnected, but there is no proof that the plaintiff had any previous experience in helping to twist the rod with a Stillson wrench or by means of chain tongs, where his fellow-servants were using, under the orders of the foreman, a 4-foot sub or pipe in the manner in which they were using the same on the occasion complained of.

Numerous experts testified for both the plaintiff and defendant as to what would constitute a reasonably safe method for doing this work, but none of them seem to have ever known of an instance where the 4-inch sub or pipe had been used by the follow-servants by pushing it through the elevator in the manner testified to, and where another servant was commanded to help them by either the use of chain tong or a wrench, since there is no dispute that the 4-foot sub or pipe was likely to slip off the pipe as it did do on the occasion in question.

Mr. Ellsey, who was on top of the oil well derrick, at the time of the accident, testified for the defendant that the plaintiff had applied the Stillson wrench to the rod and was trying to turn the same before his two fellow-servants adopted the dangerous method of inserting the 4-foot sub or pipe through the elevator and against the rod that was being turned; but even the foreman, who was within 6 or 8 feet of the other three members of the crew, gave a different version of the matter, and he did not dispute the fact that the other two servants were using the sub or pipe before the plaintiff got the wrench and undertook to help them. He did deny that he gave any orders at all to either the plaintiff or to his fellow-servants, but contended that all of them were free to and did select their tools with which to do the work.

Under the foregoing state of the case, the trial court gave to the defendant a number of instructions to the effect that even though the foreman Bradley ordered or directed the plaintiff and his other workmen to use un-

safe or improper tools, the jury nevertheless *must* find for the defendant, if the jury also believed from the evidence that the members of the crew were experienced workmen who realized that using such tools would involve a clear and immediate risk, which it would be unreasonable to incur, even under orders, if the jury also believed that there were other tools available which would have been reasonably safe and proper to use in such work. In fact, one of the instructions for the defendant was to the effect that if the jury believed from the evidence that the plaintiff, *or any fellow-workman who caused his injury,* was a skilled workman and that defendant's foreman ordered him to use the tools which plaintiff claims were unsafe, and that at the time plaintiff, *or such workman,* realized that he was incurring a manifest danger that a reasonably prudent person would not incur, even under orders, in using said tools and that there were other tools available at the place of the work which he was privileged to choose and work with instead of the alleged unsafe tools *as directed by the foreman,* then that the proximate cause of the injury was plaintiff's or his fellow-workman's failure to use the proper tools so available, if any, and that the verdict should be for the defendant.

Without setting forth in full the five erroneous instructions complained of, we deem it sufficient to say that in our opinion they were not authorized under any of the following cases, to wit: Brown v. Coley, 168 Miss. 778, 152 So. 61; Goodyear Yellow Pine Co. v. Mitchell, 168 Miss. 152, 149 So. 792, 150 So. 810; Hardaway Contracting Co. v. Rivers, 181 Miss. 727, 180 So. 800; Martin v. Beck, 177 Miss. 303, 171 So. 14; Eastman Gardiner Hardwood Co. v. Chatham, 168 Miss. 471, 151 So. 556; J. J. Newman Lumber Co. v. Cameron, 179 Miss. 217, 174 So. 571; Gow Co., Inc., v. Hunter, 175 Miss. 896, 168 So. 264; Odom et al. v. Walker, 193 Miss. 862, 11 So. (2d) 452; and Walley et al. v. Williams, 201 Miss. 84, 28 So. (2d) 579.

It is true that in the case of Brown v. Coley, supra [168 Mass. 778, 152 So. 63], the Court said: "If the master expressly and affirmatively order the servant to omit the safe method and to do the work in a dangerous way, he has waived, or rather has usurped, the duty otherwise resting on the servant and, to use a common term, he is estopped to assert that the duty to avoid the obvious danger was upon the servant, *unless the danger is so imminent that no person of ordinary prudence should encounter it, even under orders.*" (Italics ours.) But in that case no negligent order of a foreman was involved and the use of the italicized part of the above quotation was not necessary to the decision. Moreover, the writer of the opinion in that case was evidently merely recognizing a general common law rule without addressing his attention in particular to Sections 1454 and 1456, Code 1942, limiting the effect of contributory negligence and abolishing the doctrine of assumption of risk, respectively, in this state. Anyway, the statement above italicized would in our opinion be applicable only to a situation where it would be wholly unreasonable to anticipate that the servant would likely act as an insane person, or as one wholly indifferent to the inevitable consequences, and obey the order in question. For instance, if a foreman should direct a servant to step or jump off a 20-foot scaffold for the purpose of going and bringing some tool needed on the job, the utterly foolish action of the servant in obeying such an order would be the sole proximate cause of the resulting injury or death, and there could be no recovery against the master for that reason. In the instant case it was not unreasonable or incomprehensible that the servant would undertake to obey the order without first weighing the chances of consequent injury under the existing circumstances.

In the other cases above cited, most all of which were rendered since the decision of Brown v. Coley, the Court either upheld verdicts against the master where the servant was injured in carrying out a negligent order of a

foreman, or liability of the master was denied because the servant acted without an order from the foreman so. to do. Without reviewing these in detail, we merely say that an examination of the facts set forth in the opinions therein will disclose that a recovery was allowed in many of them where the servant was more negligent in obeying the order of the foreman than was the plaintiff in the instant case; that is to say, where it could be said with as good or better reason that the danger was so imminent that no person of ordinary prudence should have encountered it, even under orders. In upholding liability, the Court merely applied the above-mentioned statutes and held that there was no assumption of risk where the master was negligent and that contributory negligence was not a bar to a recovery, such negligence only being for proper consideration in the mitigation of damages.

The author of the opinion in the case of Brown v. Coley, supra, upon which the instructions in question were based, later wrote the opinion in Walley v. Williams, supra, where the plaintiff used an openface bucket to refuel a tractor engine, which was being operated with a jump spark. Some gasoline spilled and was ignited by the jump spark and the plaintiff was injured. The Court there stated the condition upon which the plaintiff could recover by saying that [201 Miss. 84, 28 So. (2d) 581] ''having admitted that he was using an open-face bucket to refuel his engine while it was in operation, he must prove that he was ordered by his foreman to do so in the manner that he did.'' In that case the danger was evidently ''so imminent that no person of ordinary prudence should encounter it, even under orders'', but the writer of the opinion there recognized that the doctrine of assumption of risk had been abolished and that the effect of contributory negligence had been limited in this state.

As a general rule, by virtue of these statutes, when once negligence has been shown on the part of the master followed by injury to the servant, the only way

the master can entirely escape liability is to show that his negligence was not a proximate cause of his injury, or, as expressed another way, that the servant's own negligence, or the negligence of a fellow-servant, was the sole proximate cause of the plaintiff's injury. However, in the instant case, as hereinbefore shown, the negligence of the two fellow-servants of the plaintiff was brought about by the direct order of the foreman, according to the testimony on behalf of the plaintiff.

 We are therefore of the opinion that all of the instructions complained of are erroneous. They eliminate entirely the question of whether or not the negligent order of the foreman was either the proximate cause or a contributing cause to the accident and injury, and they are in our opinion otherwise incorrect in that they tend to mislead the jury to apply the doctrine of assumption of risk, and to use contributory negligence as a complete bar to the action.

Reversed and remanded.